## T. J. PRIMM, COLLECTOR OF TAXES, v. W. V. FORT ET AL.

### Decided May 30, 1900.

**Taxation—National Bank Stock—Deducting Indebtedness.**

Under no circumstances, under existing taxation laws, can an owner of national bank stock be permitted to deduct his indebtedness from the value of the stock, for purposes of taxation. Rev. Stats., arts. 5063, 5064, 5079, 5080, 5081. Rev. Stats. U. S., sec. 5219.

APPEAL from McLennan, Nineteenth District. Tried below before Hon. MARSHALL SURRATT.

*Thos. S. Smith,* Attorney-General, for the State.

*Wm. W. Evans* and *H. N. Atkinson,* for appellant Primm.

*Clark & Bolinger,* for appellees.

KEY, ASSOCIATE JUSTICE.—W. V. Fort, Foster W. Fort, and J. W. Mann brought this suit to restrain T. J. Primm, collector of taxes of Mc-Lennan County, from collecting State and county taxes for the year 1894, on certain national bank stock owned by them. . They were success-ful in the court below, where a judgment was rendered enjoining the collection of the tax referred to, and the collector has appealed.

The appellees' case rests upon the proposition that, in the circum-stances disclosed by the record, they had the right, in rendering their property for taxation, to offset the value of their bank stock with their indebtedness. The trial court sustained this contention and held that, as it was shown that the appellees were indebted as much as the taxable value of their bank stock, and owned no credits from which to deduct such indebtedness in rendering their property for taxation, the bank stock was not taxable.

It is not deemed necessary to state all that was proved. Relevant to the questions presented for decision, the record discloses the following facts: Each appellee owned 250 shares of the stock of the First Na-tional Bank of Waco, located in the city of Waco, McLennan County, State of Texas. They were of the face value of $100 each, but a fair construction of the undisputed testimony leads to the conclusion that their market value was about $130 each. However, the proof shows that property in this State is generally rendered and accepted for taxation at about two-thirds of its market value; and the shares in question were assessed at that proportion of their face value, making each appellee's assessment of bank stock $16,666. It was shown that each appellee was indebted to that extent, and had no credits from which to deduct such indebtedness for purposes of taxation. It was also shown that the banking capital of this State amounted to about $25,000,000, of which $19,000,000 were invested in national banks and $6,000,000 in private banks. It was further shown that, during the year 1893, chattel mortgages were filed in Harris County amounting to $3,768,164.42; in Dallas County amounting to $969,817.25; in McLennan County amount-ing to $163,985; and in the entire State amounting to $31,466,443; and that during the same year mortgages on real estate were recorded amounting to $46,373,473, and the chattel mortgages filed in the State during the year 1894 amounted to $74,884,855.41. It was also shown that the total rendition of all property for taxation in the State for the year 1894 was $865,120,987.

There was no satisfactory proof as to the amount of money loaned at interest in this State or in McLennan County by persons or corpora-tions residing in the State. J. W. Mann testified: "I know that in this county there is a great deal of money invested in this county, bor-rowed by people from nonresident people and from loan agencies. I know that; just know that in a general way; heap of it I know abso-lutely. I have some friends in Dallas, Fort Worth, Houston, and Gal-veston, and parties that I know loan money, and a good deal of money used in the State, aside from the capital in the banks, but as to the

amount of it, it would only be an opinion. I think that such loans in Texas at that time amounted to two or three times as much as the stock of all the national banks in Texas. That is an opinion; I could not go to work and prove it. It was generally secured by a mortgage, right smart of it perhaps would be personal security, and real estate a large per cent of it. I mean the loans outside of the banks. There was a good deal of money loaned in Texas by private individuals and personally secured, that there would not be any record of. Very often men who had money in my bank would take it out and loan it on personal security. There was a good deal of money loaned on personal security of which there was no record. It was bearing interest. It was loaned on real estate and secured by chattel mortgages. Texas has been a pretty liberal borrower, but then other States have borrowed more than we. The opinion I gave as to the amount of money loaned in Texas is only a guess. I couldn't say any more about it than that the people of Texas owe a heap of money. I don't know that I could guess within $1,000,000 of what is loaned in Texas outside the banks. What I know about the loans outside of this county is from reports that I see from Austin."

W. V. Fort said: "Have been in Waco forty or fifty years. Was director and vice-president of the First National Bank. In 1894 I was fairly well posted as to the amount of money loaned in Waco. The mortgage company that I was working for was loaning money on brick storehouses and lands at that time. The Scottish-American Mortgage Company and the J. B. Watkins Mortgage Company were loaning money. I could not give you any definite amount that they would loan. The Scottish-American was not allowed to loan in this county over $500,000. I couldn't say whether they had loaned that much at that time or not. In this county and vicinity, I think the J. B. Watkins Mortgage Company had loaned from $500,000 to $1,000,000; they had no limit. Some individuals were loaning money here, such as the Abeels, the Archenholds, Higginson, Dr. Wallace, McGregor, and Symes. I know there are loans on business houses in Waco, and in fact there is hardly a business house on Austin Street that has not a loan on it. I am and was in 1894 in the fire insurance business, and on this account know about mortgages on the business houses in Waco and elsewhere. I can state there is more money loaned out in this vicinity than the stock of all the banks combined. I think that three-fourths of the business houses in Waco, directly or indirectly, have mortgages on them, and that the whole amount is as great a sum as the amount of money invested in bank stock in Waco. I do not think there would be any comparison between the amount of loans and the amount of bank stock, the loans being so much greater. The instructions to agents in Houston, Galveston, and Dallas, of insurance companies, is the same as here. In Dallas, I think the loans are much larger than they are here. The value of property there is three or four times as great and the loans three or four times as much. I can not say whether the comparison in Waco would hold good as to other cities in the State as to the money loaned and the

bank stock. I can not answer, because it is a question of knowledge, and not a question of impression. Judging from my knowledge of the condition of affairs in this county and some other counties, I think the amount of money loaned in Texas in 1894 by the loan companies would be much larger than the bank stock of the national banks in Texas. I think there would be no comparison between the two. The amount loaned would far exceed the bank stock."

E. Rotan stated: "I have lived in Waco for thirty-two years, and have been engaged in the banking and mercantile business. I am conversant with investments in national banks and loans. I am now president of the First National Bank of Waco and have been for seven years. I was president in 1894. I think that there are $25,000,000 invested in the private and national banks of the State. Probably three-fourths or four-fifths of this is national bank capital. Outside of the loans by national banks, I couldn't hazard an opinion on the amount. There was a vast amount of money loaned. I can not tell how it compares with the amount of money invested in national banks. It would be very much greater. I know it is in my own immediate vicinity. The loans of mortgage companies and individuals far exceed the amount invested in banks. In 1894 our bank had large deposits from individuals. I would have knowledge of their loaning it out in a general way. I suppose the Archenholds, leaving off Mr. Seley's private bank, loaned more money than any individuals here. There are not very many who loaned large amounts. I should think the Archenholds loaned seventy-five or a hundred thousand dollars in this county. Usually that much, perhaps more. * * * I think that the amount of money loaned by other than national banks far exceeded the amount of money invested in national banks in this State in 1894. The capital stock of the banks here at that time was just one million dollars, and I know of loans that would amount to three times that sum; besides there must be an enormous amount of private loans here that I never heard anything about. The customers of the loan companies, as a rule, are not customers of the banks. The men who borrow money from the loan companies are more of a debtor than a creditor class. The loans made by loan companies are usually for four or five years. The time of loans for the banks in 1894 was about four months. It is now a little longer."

Foster W. Fort said: "I know as a business man that there is a considerable amount of money loaned by private individuals and companies outside of the money loaned by banks. I couldn't say exactly how it compared. The banking capital of Texas amounts to about $25,000,000, and of that amount over five million is invested in private banks and $19,000,000 in national banks."

The capital stock of the First National Bank of Waco was $500,000, and it owned about $55,000 worth of real estate.

With this statement concerning the proof, we address ourselves to the consideration of the interesting questions of law involved in the appeal; and begin by setting out the following statute law of this State:

"Art. 5063: Personal property shall, for the purposes of taxation, be construed to include all goods, chattels and effects, and all moneys, credits, bonds and other evidences of debt owned by citizens of the State, whether the same be in or out of the State; all ships, boats and vessels belonging to inhabitants of this State, if registered in this State, whether at home or abroad, and all capital invested therein; all moneys at interest, either within or without this State, due the person to be taxed, over and above what he pays interest for, and all other debts due such persons over and above their indebtedness; all public stock and securities; all stock in turnpikes, railroads, canals, and other corporations (except national banks) out of the State owned by inhabitants of this State; all personal estate of moneyed corporations, whether the owners thereof reside in or out of this State, and the income of any annuity, unless the capital of such annuity be taxed within the State; all shares in any bank organized or that may be organized under the law of the United States; all improvements made by persons upon lands held by them the title to which is still vested in the State of Texas, or in any railroad company, or which have been exempted from taxation for the benefit of any railroad company or any other corporations, or any other corporations whose property is not subject to the same mode and rule of taxation as other property."

Article 5064 defines "credits" as follows:

"The term 'credits' wherever used in this title shall be held to mean and include every claim and demand for money or other valuable thing, and every annuity or sum of money receivable at stated periods due or to become due, and all claims and demands secured by deed or mortgage, due or to become due."

"Art. 5079: Every bank, whether of issue or deposit, banker, broker, dealer in exchange or stock jobber, shall at the time fixed by this chapter for listing personal property, make out and furnish the assessor of taxes, a sworn statement, showing:

"1.   If a national bank, the president or some other officer of such bank shall furnish to the assessor of the county in which such bank is located, a list of the names of all the shareholders of the stock, together with the number and amount of the shares of each stockholder of stock in said bank, and the shareholders of the stock in national banks shall render to the tax assessor of the county in which said bank is located, the number of their shares and the true and full value thereof. All shares of stock in national banks not rendered to the assessor of taxes in the county where such bank is located within the time prescribed by law for listing property for taxes shall be assessed by the assessor against the owner or owners thereof as unrendered property is assessed; but the tax roll shall show the name of the owner or owners thereof as per statement furnished by the president or other officers of said bank.

"2.   National banks shall render all other bonds and stocks of every kind, except United States bonds, and all shares of capital stocks or joint

stock or stocks of other companies or corporations held· as an investment or in any way representing assets, together with all other personal property belonging or pertaining to said bank, except such personal property as is specially exempted from taxation by the laws of the United States.

"3. National banks shall be required to render all their real estate as other real estate is rendered, and all the personal property of said national banks herein taxed shall be valued as other personal property is valued.

"4. All other banks, bankers, brokers or dealers in exchange, or stock jobbers shall render their list in the following manner:

"1. The amount of money on hand or in transit, or in the hands of other banks, bankers, brokers, or others subject to draft, whether the same be in or out of the State.

"2. The amount of bills receivable, discounted or purchased, and other credits due or to become due, including accounts receivable, interest accrued but not due, and interest due and unpaid.

"3. From the aggregate amount of the items named in the first and second of the last two subdivisions shall be deducted the amount of money on deposit.

"4. The amount of bonds and stocks of every kind, except United States bonds, and all shares of capital stocks or joint stocks of other companies or corporations held as an investment or in any way representing assets.

"5. All other property belonging or appertaining to said bank or business, including both personal property and real estate, shall be listed as other personal property and real estate.

"Art. 5080. Every banking corporation, State or national, doing business in this State shall, in the city or town in which it is located, render its real estate to the assessor of taxes at the time and in the manner required of individuals. At the time of making such rendition, the president or some other officer of said bank shall file with said assessor a sworn statement showing the number and amount of the shares of said bank, the name and residence of each shareholder, and the number and amount of shares owned by him. Every shareholder of said . bank shall, in the city or town where said bank is located, render at their actual value to the assessor of taxes all shares owned by him in such bank; and in case of his failure to do so, the assessor shall assess such unrendered shares as other unrendered property. Each share in such bank shall be taxed only for the difference between its actual cash value and the proportionate amount per share at which its real estate is assessed. The taxes due upon the shares of banking corporations shall be a lien thereon, and no banking corporation shall pay any dividend to any shareholder who is in default in the payment of taxes due on his shares; nor shall any banking corporation permit the transfer upon its books of any share, the owner of which is in default in the payment of his taxes upon the same. Nothing herein shall be so con-

strued as to tax national or State banks, or the shareholders thereof at a greater rate than is assessed against other moneyed capital in the hands of individuals.

"Art. 5081.   No person, company, or corporation shall be entitled to any deduction on account of any bond, note, or obligation of any kind given to any mutual insurance company, nor on account of any unpaid subscription to any religious, literary, scientific, or charitable institution or society, nor on account of any subscription to or installment payable on the capital stock of any company, whether incorporated or unincorporated."

It is quite clear, we think, that bank stock is merely evidence of title to shares in the capital stock of the bank, and not a "credit" from which the statute of this State authorizes the deduction of indebtedness for purpose of taxation.   It was so held in Rosenberg v. Weekes, 67 Texas, 580, and appears to be conceded by counsel for the appellees.   They contend, however, that as the State statute permits other taxpayers to deduct their indebtedness from their credits, and as the appellees have no credits to deduct theirs from, they have the right, under the Federal statute granting States permission to tax national bank property, to deduct their indebtedness from the value of their bank stock; or, rather, as their indebtedness was equal to the value of their bank stock, they claim to be exempt from the payment of any tax upon their bank stock.   The provision of the Federal statute relied upon as securing this right is the latter ·part of article 5219 of the Revised Statutes of the United States, reading thus:

"Nothing herein shall prevent all the shares of any association from being included in the valuation of personal property of the owner or holder of such shares in assessing taxes imposed by authority of the State within which the association is located, subject only to the two restrictions that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State, and that the shares of any national banking association owned by nonresidents of any State shall be taxed in the city or·town where the bank is located and not elsewhere."

In numerous instances, owners of national bank stock have sought protection under this statute from State taxation, and have invoked the decision of the Supreme Court of the United States.   In a few instances the bank stock has been held to be exempt from State taxation; but in a large majority of the cases, the Federal Supreme Court has decided, on the facts pertaining to each case, that unfriendly discrimination in taxing national bank stock was not shown and the State tax has been upheld.

In Aberdeen Bank v. Chehalis County, 166 United States, 440, the former decisions of the court are reviewed, after which the court say:

"The conclusions to be deduced from these decisions are, that money invested in corporations or in individual enterprises that carry on the business of railroads or manufacturing enterprises, mining investments

and investments in mortgages, does not come into competition with the business of national banks, and is not therefore within the meaning of the act of Congress; that such stocks as those in insurance companies may be legitimately taxed on income instead of on value, because such companies are not competitors for business with national banks; and that exemptions, however large, of deposits in savings banks, or of moneys belonging to charitable institutions, if exempted for reasons of public policy and not as an unfriendly discrimination against investments in national bank shares, should not be regarded as forbidden by section 5219 of the Revised Statutes of the United States."

And in the more recent case of First National Bank of Wellington v. Chapman, 173 United States, 205, the same court held that the term "moneyed capital," as used in article 5219, does not include capital which does not come into competition with the business of national banks; and that exemptions from taxation made for reasons of public policy and not as an unfriendly discrimination against investments in national bank shares, can not be regarded as forbidden by the statute referred to.

Mercantile Bank v. New York, 121 United States, 138, is another leading case; and it was there held that the main purpose of Congress in fixing limits to State taxation on investments in shares of national banks, was to render it impossible for the State, in levying such a tax, to create and foster an unequal and unfriendly competition by favoring institutions or individuals carrying on a similar business and operations and investments of like character. In that case the term "moneyed capital," as used in the statute, is defined to embrace capital employed in national banks, and capital employed by individuals, when the object of their business is the making of profit by the use of their moneyed capital as money—as banking, as that business is defined in the opinion of the court; but it does not include moneyed capital in the hands of a corporation, even if its business be such as to make its shares moneyed capital when in the hands of individuals, or if it invests its capital in securities payable in money.

Under these decisions, we think it is quite clear that appellees are not entitled to the relief awarded them in the court below, for the following reasons:

Except the $6,000,000 invested in private banks, it was not shown that any definite and considerable sum, coming within the definition of "moneyed capital," as that term is used in the Federal statute, and belonging to citizens of this State, was employed in competition with national banks. If it be conceded that the tax laws of this State are so framed as that an unequal and unfriendly discrimination against national banks might result, it devolves upon the person or bank seeking relief from State taxes to show such state of facts as will make it reasonably certain that such discrimination will result from an enforcement of the State law. In other words, it devolved upon the appellees to show that a relatively large sum of moneyed capital, employed in com-

petition with national banks, obtained exemption from taxation through the provision of the State statute authorizing the owners of such capital to deduct their indebtedness from their credits in rendering their property for taxation; and that the amount so exempt from taxation belonged to natural persons and not to corporations.   Proof that mortgages amounting to many million dollars were recorded in the State or in a given county during a particular year does not meet this requirement. Such proof does not show that the mortgagors transact any business that competes with the business of national banks; and if it be conceded that it indicates that money is being loaned by mortgagees in such manner as to compete with the business of national banks, still the mortgagees would not fall within the purview of the Federal statute unless they were individual citizens of the State; and would not under our State statute be subject to taxation at all, in reference to their credits, unless they reside within the State, because credits, and other choses in action are, as a general rule, taxable only in the State where their owner resides.   Cooley on Tax., 2 ed., 21, 23, 372.   Nor would proof of the fact that $50,000,000 loaned at interest by citizens of this State show that $50,000,000 worth of credits, or any other specific amount of credits, was escaping taxation.   It is true, the lenders of money, in rendering their credits for taxation, would be entitled to deduct their indebtedness therefrom; but no court, in the absence of some proof on the subject, would have the right to assume that the lenders of the money were themselves in debt to the extent of the amount they had loaned.   It can not be assumed that every creditor, and especially those engaged in business that competes with national banks, is in debt to the full extent of his credits; and in the absence of evidence on the subject it would be difficult, if not impossible, to estimate with any degree of certainty the indebtedness of that class of people.   Furthermore, Rotan, one of appellees' witnesses, testified, and there is no evidence to the contrary, that the customers of the loan companies, as a rule, are not customers of the banks—the latter limiting their loans in point of time to a few months, while the former usually make loans for four or five years.

This shows that a large amount of the loans referred to by the witnesses were not moneyed capital employed in competition with national banks.   In fact it is held in Aberdeen Bank v. Chehalis County, supra, that money invested in mortgages does not come within the purview of article 5219.   It is true, the testimony of some of the witnesses indicates that considerable money was loaned at interest by citizens of Texas; but this evidence was largely a matter of opinion, and it was not shown that the loans were made on such terms as placed the money in competition with the business of national banks; nor was it shown that as a result of such use of the money by individual citizens, the rate of interest had been decreased, or the business of national banks or the value of their stock in anywise diminished or affected.

As to the $6,000,000 invested in private banks, it is not shown what proportion thereof, if any, is invested in savings banks.   This should

have been shown, because the Supreme Court has held that capital invested in savings banks may be exempt from taxation without infringing the Federal statute under consideration. Nor does it appear that any discrimination is made by the State law between private and national banks in reference to the right to subtract debts from credits for the purpose of taxation. The statute permits national banks, in listing their property for taxation, to deduct their indebtedness from their credits, in the same manner and to the same extent that it does other taxpayers; and it does not permit the owner of stock in a private bank to deduct his indebtedness from the value of his bank stock.

Hence we reach the conclusion that appellees have wholly failed to show any such discrimination against national banks or the owners of national bank stock, as will entitle them to exemption from the payment of taxes on their bank stock.

We are also of the opinion that the owners of national bank stock in this State, while the laws enacted by the State in reference to taxation remain as they now are, would not be able to show a state of facts entitling them to deduct their indebtedness from their credits for the purpose of taxation; because we are of the opinion that our State statute permitting indebtedness to be deducted from credits for the purpose of taxation is a wise provision of law, made for reasons of public policy and not intended as nor resulting in unfriendly discrimination against investments in national banks.

In many instances, if not as a general rule, when credits are taxed, the result is duplicate taxation. For instance, when property is sold on credit, the purchaser is required to pay taxes on it, regardless of the fact that it is not paid for, and the seller is required to pay taxes upon the amount of the debt owing to him by the purchaser. Now, while such taxation is not illegal, it is, in a sense, double taxation; and it is for this reason and to mitigate to some extent this hardship that the revenue laws of many States permit taxpayers to deduct the debts owing by them. Cooley on Tax., 174, 219, 220. In some States the deduction is from the aggregate of personal estate; in others, from credits, and in still others, from mortgages only. In this State the deduction is allowed from all credits, but the deduction itself may be only partial. Article 5063 standing alone permits the deduction of all indebtedness, but this article is modified by article 5081, which specifically designates certain classes of indebtedness that shall not be deducted.

It is also important in this connection to observe the broad meaning given by our statute to the term "credits," which includes "every claim and demand for money or other valuable thing, and every annuity or sum of money receivable at stated periods, due or to become due, and all claims and demands secured by deed or mortgage, due or to become due." So, if a citizen of this State has contracted for fifty head of horses, 100 bushels of corn, or a specified number of articles of merchandise or other personal property, to be delivered in the future, his right under such contract is taxable against him as a credit.

There are many thoughtful persons who question the wisdom of taxing any credit, even a debt for borrowed money; but when the term "credits" is enlarged by legislative enactment so as to include such transactions as given in this illustration, the justice and wisdom of permitting the taxpayer to offset his credits with his indebtedness is manifest. But notwithstanding the far reaching burden which the taxing power of the State has placed upon the business and industrial energies of the people by taxing "credits" and enlarging the meaning of that term, the mitigation allowed by deduction of indebtedness has been restricted by article 5081 so as not to include all the taxpayers' indebtedness. And for some unaccountable reason, the restriction denies the right to deduct indebtedness incurred for the purpose of aiding religious, literary, scientific, or charitable institutions or societies,—a character of indebtedness from which no pecuniary benefit could be expected to result, and which it would seem that legislation should encourage instead of discourage. But this is a digression, and it is sufficient to say that it is quite manifest that the right to deduct indebtedness is only partial, both as to what may be deducted and that from which the deduction is to be made; and it has been held by the Supreme Court of the United States that partial exemptions do not infringe article 5219, especially when intended to prevent duplicate taxation. Hepburn v. School Directors, 23 Wall., 480; Adams v. Nashville, 95 U. S., 19.

Considering these facts and the further facts that a large portion of the capital of national banks is invested in government bonds that are exempt from taxation; that such banks can not be required to pay occupation taxes; that the value of real estate owned by such banks is to be deducted in determining the value of the bank stock for the purpose of taxation, and that persons in this State engaged in any pursuit that competes with the business of national banks are required by State law to pay an occupation tax, we are of the opinion that under no circumstance should the owners of national bank stock be permitted to deduct their indebtedness from the value of their stock for the purpose of taxation; and this seems to have been declared by the Supreme Court of this State in Rosenberg v. Weekes, supra, in which Chief Justice Willie, speaking for the court, said:

"We think that our laws having assessed the same percentage of taxation against every description of property, excepting a few articles exempted from public policy, and having provided means for a just and fair assessment of all moneyed capital so as to obtain as near as possible an equal rate of taxation upon all, has complied as far as possible with the true intent of the act of Congress, and its taxation of the shares of national banks is not invalid."

For the reasons given, the judgment of the District Court will be set aside and judgment here rendered that the plaintiffs take nothing by their suit; that the injunction be dissolved and the plaintiffs pay all costs of both courts.

*Reversed and rendered.*

OPINION ON MOTION FOR REHEARING.

KEY, ASSOCIATE JUSTICE.—Two points in the motion for rehearing will be briefly noted. It is charged that this court erred in holding that nonresidents, loaning money in this State, are not subject to taxation in this State upon the money so loaned. It is asserted that article 5063 of the Revised Statutes, copied in full in our former opinion, authorizes such taxation, because among other property designated as subject to taxation, the article referred to specifies "all moneys at interest, either within or without this State, due the person to be taxed, over and above what he pays interest for, and all other debts due such persons over and above their indebtedness."

The article referred to undertakes to define, for purposes of taxation, the term "personal property," and among other things, it includes "credits, bonds, and other evidences of debt owned by citizens of the State, whether the same be in or out of the State." The language just quoted precedes the phrase above quoted and relied upon by counsel for appellees in support of their contention. We think it is manifest from a reading of the entire article that the Legislature has not attempted to include as a subject of taxation credits not owned by citizens of this State; and therefore it is unnecessary to consider whether or not the Legislature has the power to levy a tax upon credits owned by non-residents.

The motion also challenges our ruling, that the terms "moneyed capital in the hands of individual citizens of such State," used in article 5219 of the Federal statutes and similar language in article 5080 of the State statute, have reference to moneyed capital owned by natural persons, and not to such capital as belongs to corporations. This ruling as to the Federal statute is supported by decisions of the Supreme Court of the United States referred to in our former opinion. It is claimed, however, that a different rule should prevail here, because the statute of this State declares that the term "person" shall be construed to include firm, company, or corporation; and because article 5080 of the Revised Statutes of this State declares that "nothing herein shall be so construed as to tax national or State banks or the shareholders thereof at a greater rate than is assessed against other moneyed capital in the hands of individuals."

In so far as the question under consideration is concerned, the State statute uses almost the exact language of the Federal statute, the only difference being that one uses the language, "moneyed capital in the hands of individual citizens of such State," while the other reads, "moneyed capital in the hands of individuals." We fail to discover any substantial difference in the language of these two statutes, and believe that the purpose of the State Legislature in placing the latter clause in article 5080 was to incorporate in the law of the State the provision of the Federal statute for the protection of national banks, adding thereto so much as was necessary to accord the same protection to State banks.

These are the only matters referred to in the motion for rehearing that call for any further discussion at our hands.

After due consideration, the motion is overruled.

*Motion for rehearing overruled.*

Writ of error refused.